IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

AMBLING MANAGEMENT COMPANY,

    Plaintiff,

        v.                  CIVIL NO.: WDQ-07-2071

UNIVERSITY VIEW PARTNERS LLC,
et al.,

    Defendants.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Ambling Management Company ("Ambling") sued University View Partners LLC ("UVP") and others for breach of contract and tortious interference with contract. UVP counterclaimed against Ambling for, *inter alia*, negligence and breach of contract. A bench trial was held May 18-22, 2009, and December 6-22, 2010. Pending are Ambling's breach of contract claim (Count 1) and UVP's counterclaims for breach of contract (Counts 1-4) and negligence (Count 6), and UVP's claim for attorneys' fees.[1] Proposed findings of fact and conclusions of law were filed by

---

[1] On August 3, 2007, Ambling sued UVP for breach of contract, and Otis Warren Management Company and Otis Warren, Jr., for tortious interference with contract. ECF No. 22. UVP counterclaimed for breach of contract (Counts 1-5 and 7), negligence (Count 6), intentional misrepresentation (Count 8) and unjust enrichment (Count 9). ECF. 5. On October 8, 2008, the Court entered judgment for Otis Warren Management Company (on Ambling's Count 2) and Otis Warren (on Ambling's Count 3), and for Ambling on UVP's counterclaim Counts 5 and 7-9. ECF No. 63.

Ambling on July 1, 2011, ECF No. 199, and by UVP on July 2, 2011, ECF No. 200. For the following reasons, the Court will find UVP liable for breach of contract and award to Ambling damages of $926,211 plus pre-judgment interest.

I. Findings of Fact

As required by Fed. R. Civ. P. 52(a), the Court makes the following findings of fact:

1.  Ambling is a Georgia corporation that operates student housing. Pl's. Ex. 1 at 1; Trial Tr. 33:13-15, 34:8-13.

2.  UVP owns University View Apartments ("University View"), an apartment building in College Park, Maryland, that houses University of Maryland students. Pl's. Ex. 1 at 1; Trial Tr. 43:3-5, 44:23-25.

3.  At all relevant times, UVP's members were Clark University View LLC (50 percent ownership), Otis Warren, Jr. (25 percent),[2] Stephen Garchik (17.5 percent), and Stephen McBride (7.5 percent). Def's. Ex. 76 at 37.

4.  On April 13, 2004, UVP and Ambling entered into an agreement (the "Agreement") under which Ambling would manage University View and be its leasing agent until July 31, 2009. Pl's. Ex. 1 at 1, 17.

---

[2] Five percent of Warren's share was owned by Warren individually and 20 percent by Warren Family LLC. Def's. Ex. 76, at 37.

5.   Warren was designated the Owner's Representative under the Agreement.  Pl's. Ex. 1 at § 2.8.

6.   James E. "Hugh" Hodge, Ambling Senior Vice President of Student Housing, oversaw Ambling's operations under the Agreement, and delegated oversight to Ambling's regional property managers.  Trial Tr. 64:12-16.

7.   Under the Agreement, Ambling had to operate and maintain University View in a "First Class Manner," "consistent with the Annual Budget."  Pl's. Ex. 1 at §§ 2.2, 3.1.

8.   The Agreement defined "First Class Manner" as "the operation and management of [University View] in the same manner as is customary and usual in the operation of comparable student housing facilities consistent with the Annual Budget."  Pl's. Ex. 1 at § 1.1.

9.   The Agreement also required Ambling to prepare an annual budget for UVP's approval and employ capable staff to maintain and lease University View.   Pl's. Ex. 1 at §§ 3.1-3.2.

10.  The 2005-2006 budget required the following positions to be filled before students moved in: property manager, assistant property manager, leasing agent, maintenance director, maintenance technician, and maintenance assistant.  Pl's. Ex. 17 at 10.

11.  University View had frequent staff turnover. Def's. Ex.
     20-37.

12.  During Ambling's tenure, at least five people acted as
     property manager: Carl Diesio, Tasha Green, Cyn Trombley,
     Andy Buelkin, and Linda Kromer.  Pl's. Ex. 118; Trial Tr.
     490:14-25.

13.  Ambling also had frequent vacancies in the assistant
     property manager and leasing positions.  Pl's. Ex. 118;
     Def's. Ex. 20-30.

14.  Warren caused some turnover: Three Ambling employees
     blamed their resignations on Warren's overbearing conduct.
     Trial Tr. 656:25-657:11, 2088:16-19, 1198:12-1199:11,
     678:1-679:6.

15.  Leasing Consultant and Assistant Property Manager Nicole
     Davisson, who left in October 2005, said Warren created a
     stressful work environment by making constant demands.
     Trial Tr. 615:19-25, 617:23-618:13, 656:25-657:11.

16.  In early February 2005, Warren directed Ambling staff to
     scan and send him within one week more than 200 signed
     leases and related documents.  Trial Tr. 344:4-8, 553:16-
     21, 656:5-12.

17.  Ambling staff, who were working out of a trailer at the
     University View construction site, had to work longer

hours to complete the scanning. Trial Tr. 347:11-15, 351:21-352:6, 1301:12-21.

18. Leasing Manager Amy Williams, who left in January 2006, said Warren harassed her and bombarded her with work. Trial Tr. 678:1-679:6.

19. Property Manager Tasha Green, who left in December 2005, said she did not like working with regional property manager Deena Downey but also complained that Warren assigned her numerous tasks in addition to her duties for Ambling. Trial Tr. 1198:12-1199:11, 2059:18-25.

20. Because of Warren's excessive involvement, Ambling staff did not know to whom they reported. Trial Tr. 1346:21-1347:16.

21. Warren's complaints twice led directly to vacancies. Pl's. Ex. 6; Trial Tr. 1194:8-17.

22. Warren complained that Diesio, the first property manager, was ineffective; Diesio resigned rather than be removed. Pl's. Ex. 1, 118.

23. Warren later hired Diesio to draft a resident handbook for University View. Trial Tr. 469:20-25; 1299:18-1300:7.

24. Ambling removed Regional Property Manager Julianne Sullivan after Warren said she had a bad attitude. Trial Tr. 1194:8-17.

25. Warren also blocked Ambling from filling certain positions by rejecting candidates Ambling thought were qualified. Trial Tr. 682:16-683:13, 1786:2-1787:13.

26. Hiring an employee whom the owner has rejected is contrary to industry custom. Trial Tr. 1714:8-1715:2, 3681:22-3682:25.

27. At Warren's request, Ambling hired Trombly as property manager; she left without notice after less than three weeks. Warren's hiring decision perpetuated the employee turnover. Trial Tr. 685:12-686:20, 687:7-11, 3392:2-5.

28. Trombly said Ambling had "micro-managed" her, provided minimal training, and made inappropriate comments about staff. Def's. Ex. 149.

29. Downey said Trombly was unqualified because she lacked property management experience. Trial Tr. 695:16-696:6.

30. Trombly expressed reservations about taking the job. Def's. Ex. 140.

31. Ambling Chief Engineer Dennis Jenkins told an Ambling property manager that two maintenance employees were incompetent; these employees remained on staff. Trial Tr. 2013:20-2014:6.

32. Warren negotiated contracts with third party vendors, even though the Agreement gave Ambling that responsibility. Trial Tr. 1316:2-1317:16; Pl's. Ex. 1 at § 3.1(a)(ii).

33. Warren hired a security company that failed to respond to student calls, watch the entrance, or check the identification of people entering the building. Trial Tr. 1318:15-1320:10.

34. Warren also handled the contract for University View's internet service, which had problems that kept Davisson at work after hours. Trial Tr. 614:4-13.

35. Warren instructed Ambling staff to tell him of any problems with third party vendors rather than resolve problems on their own. Trial Tr. 1317:13-1318:14; Def's. Ex. 119.

36. The Agreement required Ambling to prepare all leases on "the Standard Form Lease" but did not specify which party would draft that form lease. Pl's. Ex. 1 at § 4.1(f).

37. Ambling had to administer the provisions of leases, ensure that tenants received the services required under the leases, and enforce the payment of "all rents and other charges payable by the Tenants." Pl's. Ex. 1 at §§ 3.3(b) and (c).

38. Marketing materials for University View advertised "all inclusive" rent, with "utilities included" and "one easy payment." Trial Tr. 319:6-14, 703:4-9; Pl's. Ex. 39.

39. University View apartments lacked individual meters for gas, electricity, water, and sewer services. Pl's. Ex. 62.

40. Because of this, UVP worried about the potential costs of tenants' excessive use of utilities. Trial Tr. 2757:9-14, 2758:10-25.

41. Warren testified that Tana Higginbotham, an Ambling regional manager, had told him that UVP could control utility costs through a Resident Utility Billing System ("RUBS"). Trial Tr. 3015:3-23.

42. In a RUB system, a building's total utility bill is allocated among individual units based on the number and square footage of those units; if total use exceeds a predetermined cap, tenants are charged a pro rata share of the excess. Trial Tr. 224:8-225:2; Hodge Dep. Tr., Joint Ex. 14, at 220; Barkwell Dep. Tr., Joint Ex. 10, at 96-97.

43. Warren testified that Ambling officials further discussed RUBS at a July 2004 meeting in Atlanta. Trial Tr. 3018:13-3023:5-19.

44. Higginbotham denied telling Warren about RUBS. Pl's. Ex. 162, Higginbotham Dep. *de bene esse* 5:9-12.

45. Minutes of the July 2004 meeting, prepared by Warren's administrative assistant Francine Churchill, do not mention utility caps or RUBS. Pl's. Ex. 148.

46.  Ambling President William Barkwell, Sullivan, Hodge, and
     Downey had never managed a student housing property that
     used RUBS. Trial Tr. 225:4-12, 337:20-338:1, 702:10-12,
     1356:3-10.

47.  Warren also knew of no student housing property using
     RUBS.  Trial Tr. 3361:9-18.

48.  Industry experts advise against using RUBS in buildings
     without utility meters for each unit.  Trial Tr. 1719:3-
     14, 3162:23-3164:1.

49.  Ambling now argues that it would have been against
     Maryland law to use RUBS in a building without meters for
     each apartment.  ECF No. 166 at 4-13.

50.  Before the 2005-2006 school year, University View's first
     year of operation, Ambling gave UVP a sample lease to aid
     in drafting University View's lease.  Trial Tr. 1234:11-
     24, 1769:23-1770:13, 1825:15-22.

51.  The sample lease provided for utility caps and the
     collection of utility overages, but was based on a
     building with utility meters for each unit.  Trial Tr.
     1234:11-24, 1769:23-1770:13, 1825:15-1826:2.

52.  Ambling Chief Operating Officer Kimberly Ann Barkwell
     testified that Ambling offered to have its attorneys make
     any necessary changes to the lease for University View;

she said Warren declined the offer. Trial Tr. 1769:14-1770:13.

53. Warren testified that he never agreed to prepare the lease. Trial Tr. 3029:5-3030:5.

54. Warren also testified, however, that he sent drafts of the lease to attorneys at Clark University View LLC, UVP's 50 percent partner, for review. Trial Tr. 3032:19-3034:19.

55. UVP made several changes to the lease. Trial Tr. 1235:7-1236:12.

56. In November 2004, UVP told Ambling to insert dollar amounts specific to University View into the utility cap provision: tenants would have to reimburse UVP their pro rata share of excess utility charges if, in a three-month period, their charges for heat, water, sewage, and electricity

> exceed[ed] $267.75 per tenant if the Suite is a 708-844 square foot two bedroom, two bath; $282.75 per tenant if the Suite is a 1099-1195 square foot two bedroom, two bath; $355.50 per tenant if the Suite is a 1124-1224 square foot four bedroom, two bath; $370.50 per tenant if the Suite is a 1423 square foot four bedroom, two bath; $370.50 per tenant if the Suite is a 1282-1377 square foot four bedroom, four bath . . .

Pl's. Ex. 61.

57. According to Stephen McBride, a UVP partner, UVP intended to pay a fixed amount of utility costs per unit. Trial Tr. 2788:1-19.

58. The draft lease, however, had blanks in which to insert fixed utility costs per tenant. Pl's. Ex. 61; Trial Tr. 2788:1-13.

59. McBride inserted dollar amounts in the blanks without changing "per tenant" to "per unit." Trial Tr. 2788:1-2790:20; Pl's. Ex. 61.

60. McBride noticed the discrepancy and wondered if "per tenant" meant the same thing as "per unit." Trial Tr. 2788:6-13.

61. McBride discussed the discrepancy with a UVP attorney but not with Ambling. Trial Tr. 2890:14-25.

62. Ambling added McBride's numbers to the lease, and UVP reviewed and approved the lease. Pl's. Ex. 141, Trial Tr. 1772:22-25.

63. As a result of the "per tenant" language, tenants' utility use in the first year likely never exceeded the cap based on use per unit. *See* Trial Tr. 2788:1-2790:20, 2890:14-25.

64. Ambling made no attempt to collect utility overages from tenants. Trial Tr. 1462:3-16.

65. Without utility meters for each unit, Ambling did not know how to determine whether individual tenants had exceeded their caps. Trial Tr. 1462:3-8.

66. Ambling officials understood that UVP intended to enforce the utility cap provision only after utility meters for each unit were installed. Trial Tr. 1462:3-24.

67. The 2005-2006 budget, which UVP approved, did not include any line item or reference to revenue from utility overages. Pl's. Ex. 17; Trial Tr. 338:2-14, 1173:4-1174:8, 1184:7-15, 1535:20-19, 3360:22-3361:3.

68. Under industry custom, an owner expecting ancillary utility income from a property includes a line item for such income in the property's budget. Trial Tr. 3172:24-1373:5.

69. A lease may, however, contain a utility cap provision to encourage students to conserve utilities. Trial Tr. 227:22-228:5.

70. On December 15, 2005, during preparations for leasing for the 2006-2007 school year, Warren proposed new lease provisions about utility overages. Trial Tr. 2308:5-14; Pl's. Ex. 70; Garchik Dep. Tr. 133:13-134:11.

71. The proposed new provisions included a table into which dollar amounts were to be inserted as utility caps, but Warren failed to provide any dollar amounts. Pl's. Ex. 70.

72. A proposed provision included before the table explained that tenants could be charged a pro rata share of the building's utility costs. Pl's. Ex. 70.

73. On December 15, 2005, Deena Downey, an Ambling regional property manager, asked Warren whether an attorney had reviewed the provision; Warren did not respond. Trial Tr. 3354:4-3354:16.

74. Downey added the proposed provision to the draft 2006-2007 lease. Trial. Tr. 696:3.

75. Downey and Warren exchanged several emails with additional changes. Trial Tr. 696:4-12.

76. To an email attachment sent by Churchill on January 20, 2006, Warren added a note to the proposed utilities section of the lease, asking, "Where is the utility cap[?]" Trial Tr. 696:13-697:25; Pl's. Ex. 72.

77. Downey thought Warren was referring to the utility cap provision from the 2005-2006 lease; she re-inserted that text into the 2006-2007 lease, designating the table with blanks as Section 4 of the lease and the 2005-2006 provision combined with Warren's proposed provision before the table as Section 3 of the lease. Trial Tr. 698:5-14; Def's. Ex. 7.

78. On March 2, 2006, Downey sent the amended draft to Warren for review. Trial Tr. 698:5-14; Pl's. Ex. 116.

13

79. On behalf of Warren, Churchill approved the final version of the lease with the 2005-2006 utility provision and the proposal with the table with blanks. Trial Tr. 699:8-12.

80. On August 15, 2006, after tenants signed the 2006-2007 leases, Warren told Downey that the utility cap provision was incorrect. Trial Tr. 699:13-21; Def's. Ex. 46.

81. Downey and Hodge drafted an addendum to the lease, which noted an "obvious error" and deleted Warren's proposal from Section 3 of the lease; the addendum contained the 2005-2006 utility cap provision and the table with blanks. Trial Tr. 699:22-25; Def's. Ex. 11.

82. Downey forwarded the utility addendum to Warren; he did not object. Trial Tr. 700:1-8.

83. Downey had new students sign the utility addendum as they moved in. Trial Tr. 700:9-17.

84. For the second year, tenants' utility use likely never exceeded the caps based on use per unit. *See* Trial Tr. 2788:1-2790:20, 2890:14-25.

85. Ambling again made no attempt to collect utility overages. Trial Tr. 1462:3-16.

86. The UVP-approved budget for the 2006-2007 school year did not include any line item or reference to revenue from utility overages. Pl's. Ex. 29; Trial Tr. 3365:3-11.

14

87. Throughout Ambling's tenure, UVP alleged many deficiencies. Pl's. Ex. 2, 4, 6; Def's. Ex. 114, 116, 117, 120, 125, 146, 150, 155, 160, 161.

88. On February 10, 2005, Warren sent a letter to Ambling's president, William Barkwell, complaining that Ambling was in default because the leasing office was disorganized, Diesio had worn a wrinkled shirt, the "office grounds [were] filthy," staff cars filled visitors' spots, and Ambling was inefficient in finalizing lease applications. Pl's. Ex. 2.

89. Barkwell responded in writing and by conference call, promising to speak to staff about Warren's concerns. Pl's. Ex. 3, 28, 114; Trial Tr. 55:23-59:14, 1231:7-19.

90. On April 21, 2005, Warren emailed Hodge to complain, without elaboration, that problems discussed at monthly meetings "do not get done." Def's. Ex. 114.

91. On April 27, 2005, Warren told Hodge in an email that UVP was putting a "punchout person" at University View because "Ambling is unable to adequately cover the job on the schedule needed to open on time." Def's. Ex. 116.

92. On July 6, 2005, Warren complained that Ambling had not placed a full-time property manager on site; Warren said waiting until five days before students moved in would be too late. Def's. Ex. 117.

93. On July 25, 2005, Warren sent William Barkwell a letter alleging that Ambling had defaulted under paragraphs 2.2, 3.1, 3.2, and 3.3 of the Agreement, but Warren provided no details of the alleged defaults. Pl's. Ex. 4.

94. On July 29, 2005, Warren met with Ambling representatives and presented a list of 30 alleged deficiencies. Pl's. Ex. 6, Trial Tr. 1251:6-17.

95. The alleged deficiencies included failures to maintain sufficient staffing levels, complete a resident handbook for tenants, finalize security plans, provide maintenance training for employees, and establish plans for handling trash. Pl's. Ex. 6.

96. During the meeting, Ambling responded to each of the concerns, many of which had been resolved. Trial Tr. 64:17-20.

97. By August 1, 2005, University View was fully staffed as required by the budget. Pl's. Ex. 19.

98. Warren was satisfied with Ambling's response in setting up the July 29, 2005 meeting and believed Ambling took his concerns seriously. Joint Ex. 1, Warren Dep. 343:1-14.

99. From August 2005 to September 2006, UVP complained many more times about Ambling's alleged deficiencies, including an employee parking in a handicap space, lax security, tenant parties, carpet stains, failure to consistently

16

file court notices of delinquent rent payments, failure to
properly advertise University View on the University of
Maryland's off-campus housing website, budget amendments
for maintenance contracts, and failure to post state and
federal employment notices. Def's. Ex. 120, 125, 146,
150, 155, 160, 161.

100. On August 30, 2006, Warren wrote to William Barkwell that
UVP had decided that Warren should take over management of
University View. Pl's. Ex. 8.

101. The Agreement allowed UVP to terminate if Ambling breached
any material obligation and default continued for 15 days
after UVP gave Ambling notice. Pl's. Ex. 1 at § 7.2(e),
(g).

102. Alternatively, UVP could terminate without notice if
Ambling committed gross negligence. Pl's. Ex. 1 at §
7.2(c).

103. The only evidence at trial about the meaning of gross
negligence came from William Barkwell, who testified that
gross negligence meant an "illegal and intentional act
that would damage the other party," for example, locking
doors to the building and not letting students in.   Trial
Tr. 53:7-18.

104. On September 11, 2006, William Barkwell wrote to Warren
     that UVP could not terminate the Agreement because there
     had been no default. Pl's. Ex. 9.

105. On September 13, 2006, Warren terminated the Agreement,
     effective October 15, 2006. Pl's. Ex. 10.

106. In his letter, Warren said Ambling had failed to cure the
     deficiencies noted in Warren's July 25, 2005 letter; the
     only failure he cited was insufficient staff. Pl's. Ex.
     10.

107. In September 2006, after deciding to terminate the
     Agreement, Warren hired Ambling's maintenance staff,
     including Jenkins and the two employees whom Jenkins
     considered incompetent. Trial Tr. 2080:3-2081:8.

108. Warren also tried to hire Ambling's Assistant Property
     Manager Tara Adams and Leasing Consultant Maria Willis.
     Trial Tr. 509:5-18; Joint Ex. 1, Warren Dep. 523:12-19;
     Pl's. Ex. 35.

109. Financial performance is an indicator of successful
     property management. Trial Tr. 1566:17-20; 3667:7-18.

110. Ambling fully leased the property for the 2005-2006 and
     2006-2007 school years, and had waiting lists both years.
     Trial Tr. 1302:23-1303:6, 3390:3-11.

111. Under Ambling's management, the property exceeded budget
     projections for the 2005-2006 school year for net income

18

(by $343,000), total income (by $443,000), controllable

cash flow (by $317,000), and cash flow before debt service

(by $311,000). Trial Tr. 1568:25-1570:8, 3397:21-3398:8;

Pl's. Ex. 7.

112. Ambling prevented delinquency and bad debt beyond

expectations in the 2005-2006 school year; it kept write-

offs at .02 percent (.08 percent under budget). Trial Tr.

1567:6-22; Pl's. Ex. 7.

113. The tenant retention rate from 2005-2006 to 2006-2007 was

50-60 percent; the average student housing retention rate

is below 50 percent. Trial Tr. 1565:16-1566:5.

114. Under the Agreement, Ambling was to be paid three percent

of gross monthly receipts on a monthly basis. Pl's. Ex. 1

at § 6.1.

115. UVP terminated the Agreement with 33 months remaining in

its term. Pl's. Ex. 10.

116. As a result, Ambling sustained damages of $926,211 plus

prejudgment interest. Trial Tr. 80:5-81:11; Pl's. Ex. 11.

117. Ambling did not realize any significant cost savings as a

result of the termination of the Agreement. Trial Tr.

1791:22-1792:15, 1634:4-1635:16.

118. The Agreement contained the following indemnification

provision:

[Ambling] agrees to indemnify and hold harmless [UVP] and [UVP's] officers, employees, and agents, against all claims, losses, damages, liabilities, costs or expenses (including, without limitation, attorney's fees, and costs of litigation and/or settlement, whether incurred as a result of a claim by a third party or an indemnity hereunder) arising from [Ambling's] activities under this Agreement or [Ambling's] breach of this Agreement, including any such activity or breach by any employee, contractor or agent of [Ambling]. Such indemnity shall survive for a period of twelve months after termination of this Agreement.

II. Conclusions of Law

Ambling asserted that UVP breached the Agreement by terminating before July 31, 2009. UVP countered that its termination did not breach the Agreement because Ambling defaulted by committing gross negligence and failing to maintain and manage University View in a first class manner, employ sufficient capable staff, and enforce UVP's rights under the leases.[3] UVP further alleged that Ambling committed negligence by failing to properly draft and implement a utility recoupment provision in the leases.

A. Breach of Contract (Ambling's Count 1 and UVP's Counts 1-4)

Under Maryland law, the elements of a breach of contract claim are: (1) a contractual obligation and (2) a breach of that obligation. *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776

---

[3] Because UVP's defenses are substantially similar to its breach of contract counterclaims, the Court will address them collectively.

A.2d 645, 651 (2001). A breach is material if further performance of the contract would be "different in substance from that which was contracted for." *Barufaldi v. Ocean City Chamber of Commerce*, 196 Md. App. 1, 23, 7 A.3d 643, 657 (2010). Materiality is a question of fact. *Speed v. Bailey*, 153 Md. 655, 661-62, 139 A. 534, 537 (1927). A party to a contract cannot prevent the other party from performing, and then use that nonperformance as an excuse for its own breaches. *David A. Bramble, Inc. v. Thomas*, 396 Md. 443, 461, 914 A.2d 136, 147 (2007); *7-Eleven, Inc. v. McEvoy*, 300 F. Supp. 2d 352, 360 (D. Md. 2004); *Eaglehead Corp. v. Cambridge Capital Group, Inc.*, 170 F. Supp. 2d 552, 562 (D. Md. 2001).

UVP had contractual obligations under the Agreement until July 31, 2009, absent Ambling's gross negligence or a material breach. UVP terminated the Agreement 33 months early. Thus, Ambling must prevail on its breach of contract claim unless: (1) UVP had grounds to terminate early because of Ambling's gross negligence or material breach and (2) UVP did not contribute to Ambling's breach.

1. Capable Personnel (UVP's Count 3)

UVP argues that its early termination was not a breach, because Ambling violated § 3.2 of the Agreement by failing to have sufficient, capable staff. UVP further argues that this

failure allowed UVP to terminate the Agreement early under §
7.2.

Although University View lacked proper management and staff
during Ambling's tenure as manager,[4] UVP was largely to blame.
At least three Ambling employees resigned because of Warren's
excessive involvement and demands. Warren also prevented
Ambling from filling vacancies with qualified candidates. To
comply with industry custom, Ambling deferred to Warren's hiring
preferences. Despite the reservations of Ambling and Trombley,
Ambling hired Trombley as property manager at Warren's request.
Trombley resigned within three weeks. Because Warren
contributed significantly to the high turnover, Ambling's lack
of sufficient staff was not a basis for terminating the
Agreement early. *See David A. Bramble, Inc.*, 396 Md. at 461; *7-
Eleven, Inc.*, 300 F. Supp. 2d at 360; *Eaglehead Corp.*, 170 F.
Supp. 2d at 562.

UVP has failed to establish that the staff remaining at
University View was incompetent. Although UVP asserted that
Diesio and two maintenance workers were incompetent, Warren
later offered them jobs. Warren also hired Ambling's chief
engineer and made job offers to an assistant property manager
and leasing consultant. Under Ambling's tenure, University View

---

[4] The Court previously found no genuine factual dispute on this
point. ECF No. 63.

was fully leased for the 2005-2006 and 2006-2007 school years, and had waiting lists both years. The property also exceeded budget projections. UVP has failed to prove that Ambling lacked capable staff or that staffing levels were insufficient for reasons other than Warren's interference.

2. First Class Manner (UVP's Counts 1-2)

UVP asserted that it properly terminated the Agreement early because Ambling failed to manage and operate University View in a first class manner as required under §§ 2.2 and 3.1 of the Agreement. UVP argued that, in addition to Ambling's alleged staffing deficiencies, Ambling failed to maintain clean grounds and organized offices and gave tenants leases that contained incorrect utility cap provisions.

Because UVP caused the staffing problems,[5] it cannot justify its early termination of the Agreement on the basis of staffing deficiencies. Problems such as disorganization, dirty grounds, and failure to keep up with the construction "punchout" may well have been avoided had Ambling been permitted to fully staff the project without interference from Warren. Further, many of the deficiencies were not material breaches; an employee wearing a wrinkled shirt or parking in a handicapped space is not a material breach. See Barufaldi, 196 Md. App. at 23, 7 A.3d at

---

[5] See supra Part A.1.

23

657. Further, UVP did not establish that such deficiencies lasted 15 days or more after Ambling had notice.

UVP also cannot blame Ambling for operational problems involving third party vendors that UVP selected. Warren hired the security company that failed to respond to student calls, watch the entrance, or check identification of visitors. Warren also handled the contract for University View's internet service, about which tenants complained. Warren told Ambling staff to forward complaints about third party vendors to him rather than address problems directly. UVP cannot rely on problems with third party vendors for its early termination of the Agreement. *See David A. Bramble, Inc.*, 396 Md. at 461; *7-Eleven, Inc.*, 300 F. Supp. 2d at 360; *Eaglehead Corp.*, 170 F. Supp. 2d at 562.

UVP also has failed to prove that Ambling was contractually obligated to draft and enforce correct utility cap provisions in the lease. The Agreement did not specify which party had to draft the leases. UVP's utility provision was inserted by Ambling without change into the draft lease for the 2005-2006 and 2006-2007 school years. Although McBride worried that his utility cap provision in the 2005-2006 lease was incorrect, he did not tell Ambling. Similarly, the utility provision in the 2006-2007 lease came from Warren. UVP approved both leases in their final form. UVP made no objections to Ambling's addendum

to the 2006-2007 lease. UVP cannot blame Ambling for its own errors. *See David A. Bramble, Inc.*, 396 Md. at 461; *7-Eleven, Inc.*, 300 F. Supp. 2d at 360; *Eaglehead Corp.*, 170 F. Supp. 2d at 562.

Ambling had no implied duty to draft and enforce utility cap provisions, because such provisions were not usual or customary for unmetered student housing buildings. Industry experts advise against using RUBS in buildings without utility meters for each apartment. Barkwell, Sullivan, Hodge, Downey, and Warren knew of no student housing property that used RUBS. UVP has failed to establish that Ambling breached its obligation to manage University View in a first class manner.[6]

    3. Enforce the Rights of UVP and Obligations of Tenants

        (UVP's Count 4)

UVP argues that the incorrect utility cap provisions breached § 3.3(b) of the Agreement, which required Ambling to enforce the rights of UVP and the obligations of tenants under the lease.

Although the Agreement required Ambling to enforce the lease provisions, Ambling established at trial that the utility provision was unenforceable and contrary to UVP's intentions.

---

[6] Because the Court finds that Ambling had no duty to draft or enforce the utility cap provision, the Court need not address Ambling's argument that such a provision would have been illegal.

Without meters for each unit, Ambling had no way of measuring whether a tenant or unit's use exceeded the caps in the lease. Moreover, UVP had not intended to collect overages: the UVP-approved budgets for the 2005-2006 and 2006-2007 school years had no line items for utility overages. The apartments were marketed as "all inclusive." Accordingly, UVP cannot rely on the incorrect utility cap provisions or Ambling's failure to collect overages to justify UVP's early termination. UVP has not established that Ambling breached its obligation to enforce UVP's rights and tenants' obligations under the leases.

4. Gross Negligence (UVP's defense to Ambling's Count 1)

UVP asserts that the incorrect utility cap provisions constituted gross negligence, which justified UVP's early termination of the Agreement under § 7.2(c).

The Agreement does not define gross negligence. The only trial testimony about the meaning of gross negligence came from Ambling President William Barkwell, who said it meant an "illegal and intentional act that would damage the other party." Maryland courts have defined gross negligence as "an intentional failure to perform a manifest *duty* in reckless disregard of the consequences as affecting the life or property of another." *Taylor v. Harford Cnty. Dep't of Soc. Servs.*, 384 Md. 213, 229, 862 A.2d 1026, 1035 (2004) (emphasis added). Ambling had no duty

to draft or enforce utility cap provisions[7]; thus, Ambling's failure to do so was not gross negligence.

Ambling has established that UVP terminated the Agreement early, but UVP has failed to establish that its early termination was justified. Ambling did not commit gross negligence, violate its obligation to enforce UVP's rights and tenants' obligations under the leases, or breach its obligations to provide sufficient capable staff and manage University View in a first class manner. Thus, the Court will enter judgment for Ambling on Count 1 of Ambling's claim and Counts 1-4 of UVP's counterclaim.

B. Damages

When a party breaches a contract, the injured party is entitled to damages that arise naturally, "according to the usual course of things," from that breach. *Strasbaugh v. Steward Sanitary Can Co.*, 127 Md. 632, 648, 96 A. 863, 868 (1916). A court may also award pre-judgment interest when "the obligation to pay and the amount due [has] become certain, definite and liquidated by a specific date prior to judgment." *Buxton v. Buxton*, 363 Md. 634, 656, 770 A.2d 152, 165 (2001). Pre-judgment interest compensates the non-breaching party for

---

[7] *See supra* Part A.2.

27

its "inability to use the funds that should have been in [its] hands at some earlier time." *Id.* at 652, 770 A.2d at 162-63.

Had UVP not terminated the Agreement early, Ambling would have received $926,211. That amount was certain and liquidated before trial. Thus, Ambling is entitled to $926,211 plus pre-judgment interest.

C. Negligence (UVP's Count 6)

UVP alleges that Ambling was negligent in its duty under § 2.2 of the Management Agreement to provide all services necessary for operation in a first class manner because it did not properly implement a utility recoupment provision.[8]

Under Maryland law, the elements of a negligence claim are: (1) a duty to the plaintiff, (2) a breach of that duty, (3) a causal relationship between the breach and the harm suffered, and (4) damages. *Schultz v. Bank of America N.A.*, 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010). Because Ambling had no duty to implement a utility cap provision,[9] its failure to do so was not

---

[8] In its negligence claim, UVP cited § 2.1, which states only that Ambling is an independent contractor and has leasing duties under the Agreement. UVP correctly cited to § 2.2 in later filings. *See, e.g.*, ECF No. 200 at 74.

[9] *See supra* Part A.2.

negligence. The Court will enter judgment for Ambling on Count 6 of UVP's counterclaim.[10]

III. Conclusion

For the reasons stated above, the Court finds UVP liable for breach of contract and will award damages to Ambling in the amount of $926,211 plus pre-judgment interest.

_9/8/11_
Date

_____
William D. Quarles, Jr.
United States District Judge

---

[10] Because UVP has not prevailed on the merits of any claims, the Court need not address its request for attorneys' fees.